**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JOHN W.,[1]

Plaintiff,

v.

Case No. 18-cv-2453-RMM

KILOLO KIJAKAZI,[2]
Acting Commissioner of Social Security,

Defendant.

## MEMORANDUM OPINION AND ORDER

Plaintiff John W. brings this action under the Social Security Act, 42 U.S.C. § 405(g),

seeking review of a decision of the Commissioner of Social Security ("the Commissioner") to

partially deny his claim for disability insurance and supplemental security income benefits.  The

ALJ found Mr. W. to be disabled and eligible for benefits, but concluded that the disability arose

at a date approximately three years later than the alleged onset of his disability.  District Judge

John D. Bates referred the case to the undersigned for all purposes and trial upon the parties'

consent to proceed before a magistrate judge.  *See* Referral Order, ECF No. 20.  Pending before

the Court are Mr. W.'s Motion for Judgment of Reversal, ECF No. 15, and the Commissioner's

---

[1] Plaintiff's name has been partially redacted in keeping with the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.  *See* Mem. from Hon. Wm. Terrell Hodges, Chair, Comm. on Ct. Admin. & Case Mgmt., to Chief Judges of the U.S. Cts. of Appeals, Chief Judges of the U.S. Dist. Cts., Clerks of the U.S. Cts. of Appeals, and Clerks of the U.S. Dist. Cts. (May 1, 2018), *available at* https://www.uscourts.gov/sites/default/files/18-ap-c-suggestion_cacm_0.pdf.

[2] Kilolo Kijakazi became Acting Commissioner of Social Security on July 9, 2021. Pursuant to Federal Rule of Civil Procedure 25(d) and the last sentence of 42 U.S.C. § 405(g), Ms. Kijakazi is substituted for Nancy A. Berryhill as the Defendant in this case.

Motion for Judgment of Affirmance, ECF No. 17. Upon consideration of the Administrative

Record,[3] the parties' briefs,[4] and relevant legal authorities, the Court **DENIES** Mr. W.'s Motion

for Judgment of Reversal and **GRANTS** the Commissioner's Motion for Affirmance for the

reasons set forth below.

## BACKGROUND

Mr. W. has filed multiple applications for social security insurance and disability

insurance benefits, which have gone through multiple levels of review prior to the ruling at issue

in the instant matter. Mr. W. protectively applied for disability insurance benefits on December

18, 2013, and then protectively applied for supplemental security insurance on February 28,

2014. AR 22. He applied for disability benefits again on December 2, 2015. AR 808. The

claims were based on numerous impairments and diagnoses, but Mr. W.'s right wrist impairment

and bilateral shoulder impairments are the focus of his appeal and this memorandum opinion and

order. *See* Pl.'s Br. at 4–11; Def.'s Mot. at 7–10. In each application, Mr. W. alleged a disability

onset date of May 15, 2013. AR 22, 808. Mr. W. was fifty-two years old at the time of his

initial application. AR 36 (noting birthdate). He is a high school graduate who previously

---

[3] References to page numbers in the Administrative Record ("AR"), ECF No. 12, are to the page numbers provided in the lower right-hand corner of each page of the AR.

[4] The following filings and documents are relevant for this Memorandum Opinion: Complaint ("Compl."), ECF No. 1; Pl.'s Mot. J. Reversal ("Pl.'s Mot."), ECF No. 15; Pl.'s Br. in Support of Mot. J. Reversal ("Pl.'s Br."), ECF No. 15-2; Def.'s Mem. in Support of Mot. J. Affirmance ("Def.'s Mot."), ECF No. 17. The Commissioner also filed its memorandum at ECF No. 18. The Court will refer to ECF No. 17 in this Memorandum Opinion.

Throughout, page citations to documents in the record other than the AR, *see supra* note 3, refer to the document's original pagination, unless the page is designated with an asterisk (e.g., *1), in which case the reference is to the pagination assigned by PACER/ECF.

worked as an independent contractor, delivering televisions, and as a medical technician.  AR 24–25, 861.

Mr. W.'s benefits claims have all been denied upon review except for the claim underlying the most recent partially favorable decision granting him supplemental security income benefits beginning October 28, 2016.  AR 830.  An Administrative Law Judge ("ALJ") conducted a hearing and concluded that Mr. W. was not disabled, and thus not eligible for disability insurance benefits under sections 216(i) and 223(d) of the Social Security Act, from his alleged onset date through the date last insured.  *See id*.  But the ALJ found Mr. W. disabled, and thus eligible for supplemental security income under section 1614(a)(3)(A) of the Social Security Act, beginning October 28, 2016.  *See id*.  Mr. W. did not submit a request for review of this decision to the Appeals Council.  Mr. W. now asks this Court to reverse the ALJ's opinion, find that he was disabled prior to October 28, 2016, and order the Social Security Administration ("SSA") to award him benefits pursuant to 42 U.S.C. § 405(g).

## I.    Legal Framework

To qualify for benefits under the Social Security Act, a claimant must demonstrate a disability that renders him unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(a), 423(d)(1)(A), 1382(a)(1), 1382c(a)(3)(A).  An applicant must support his claim with "[o]bjective medical evidence."  *Id.* § 423(d)(5)(A).

The Commissioner uses a five-step process to determine whether a claimant is disabled under the Act.  *See* 20 C.F.R. §§ 404.1520, 416.920; *see also Butler v. Barnhart*, 353 F.3d 992, 997 (D.C. Cir. 2004) (describing each step).  At step one, the claimant must show he is not

engaged in "substantial gainful activity."  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  At step

two, the claimant must show he has a "severe medically determinable physical or mental

impairment" or a combination of severe impairments that meets certain duration requirements

under the regulations.  *Id.* § 416.920(a)(4)(ii).  At step three, the Commissioner must determine

whether the claimant's impairment or impairments meet or equal an impairment in the

Commissioner's Listings maintained at 20 C.F.R. pt. 404, subpt. P, app. 1.  If the claimant's

impairment is listed, or if his impairments together "equal" an impairment in the Listings, the

Commissioner will conclude that the individual is disabled and end her inquiry.  *Id.* §§

404.1520(a)(4), 416.920(a)(4); *see also Petty v. Colvin*, 204 F. Supp. 3d 196, 200 (D.D.C. 2016).

A claimant is not necessarily precluded from receiving benefits if his impairments do not

meet or equal any entry in the Listings.  The Commissioner must next assess the claimant's

residual functional capacity, or "RFC."  20 C.F.R. § 404.1520(a)(4), (e); *id.* § 416.920(a)(4), (e).

Residual functional capacity measures what an individual "can do in a work setting" despite the

person's physical and mental limitations.  *Id.* § 404.1545(a)(1).  The RFC is then used to

determine, at step four, whether the claimant's impairments prevent him from performing "past

relevant work," *id.* §§ 404.1520(a)(4), 416.920(a)(4), and at step five, whether the claimant can

perform other work that exists in the national economy consistent with the claimant's RFC, age,

education, and work experience.  *See id.*; *see also Butler*, 353 F.3d 997.  If an individual's claim

fails at either of these steps, the Commissioner will conclude that the individual is not disabled

and deny the claimant's benefits request.  *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

## II.    Record Evidence

Mr. W. has been diagnosed with several severe physical impairments, including obesity,

right hand/wrist degenerative joint disease with triangular fibrocartilage complex tear, tendonitis,

crystalopathy, carpal tunnel syndrome, status-post arthroscopy, debridement of right wrist and extensor carpi ulnaris tenolysis, left shoulder tendinitis, gout, degenerative joint disease of the right knee, gastroesophageal reflux disease ("GERD"), degenerative joint disease of the shoulders, and right foot proximal fifth metatarsal bone island. AR 25, 811. The Court will focus its record evidence discussion on Mr. W.'s right wrist and bilateral shoulder impairments, despite numerous other impairments illustrated in the AR, because the parties' briefs emphasize these impairments. *See* Pl.'s Br. at 4–11; Def.'s Mot. at 7–10.

### A. Right Wrist Impairment

Mr. W. has sought treatment for his right wrist impairment since 2013, with varying success. He first saw Dr. Nicole Richardson, his then-primary care physician, for hand discomfort and tingling in April 2013. AR 479. Dr. Richardson noted that Mr. W. had good range of motion of his bilateral hands, there was no swelling or erythema in either hand, and that there was mild tenderness in his right hand and wrist. AR 480. Dr. Richardson diagnosed Mr. W. with right hand pain and, as part of his treatment plan, recommended using over-the-counter non-steroidal anti-inflammatory drugs ("NSAIDs"), wearing a brace, and taking frequent breaks at work. *See id.* X-rays taken of Mr. W.'s right wrist after this examination showed normal findings other than trace degenerative changes in the right wrist without acute findings or significant arthropathy and a lesion in the distal ulnar diaphysis. AR 515.

After Mr. W.'s initial examination with Dr. Richardson, he began seeing orthopedists for his right wrist pain. Dr. Richardson first referred Mr. W. to Dr. William Burner, an orthopedist. AR 470. At their initial meeting, in July 2013, Dr. Burner noted a normal wrist examination except for minimal pain with stress of the distal radial ulnar joint. AR 471. Dr. Burner diagnosed Mr. W. with possible early degenerative joint disease of the right wrist and injected Mr. W.'s distal radial ulnar joint with Kenalog—an anti-inflammatory steroid. *See id.* Dr.

Burner then ordered an MRI, which showed findings consistent with early degenerative joint disease of the right wrist with tendonitis. AR 461. The treatment plan at the end of this visit included using a splint, moderating activity, and taking NSAIDs. *See id.* Mr. W. then saw Dr. Burner almost four months later after reporting minimal relief from the Kenalog injection. AR 457. He complained that he felt pain especially when he engaged in heavy lifting at work, and that his splint provided minimal relief. *See id.* Dr. Burner injected Mr. W. with Kenalog again. AR 458. In January 2014, Mr. W. returned and reported minimal relief after his Kenalog injection, but Dr. Burner examined Mr. W.'s wrist, noted no change in pain or symptoms, and recommended that Mr. W. continue wearing a splint. AR 455–56.

Mr. W. began seeing Dr. Sean Johnson, another orthopedist, for his right wrist pain. AR 586. During the initial consultation in April 2014, Dr. Johnson's evaluation found mild tenderness at the radial scaphoid articulation and distal to the ulna at the triangular fibrocartilage complex, full flexion-extension of the wrist, and that the distal radial ulnar joint was not tender. AR 587. Upon consideration of the physical examination and Mr. W.'s record, Dr. Johnson opined that Mr. W.'s right wrist pain was "sufficiently severe to prevent him from working." AR 587–88. Dr. Johnson then injected Mr. W. with Celestone—an anti-inflammatory steroid—and Lidocaine and recommended he continue wearing a splint. AR 588. At his follow-up visit in June 2014, Mr. W. reported "quite dramatic relief of symptoms" after the steroid injection and wearing his brace. AR 594. He still experienced pain when lifting heavy objects but felt his symptoms had significantly improved and he had no complaints regarding the radial aspect of his wrist. AR 594–95. But this relief did not last.

Mr. W.'s right wrist pain returned soon after his first follow-up visit with Dr. Johnson and became severe enough to require surgical intervention. Mr. W. sought Dr. Johnson's

assistance in July 2014 after attempting to return to work in a position that involved lifting and only lasting two days.  AR 598.  Mr. W. reported significant pain over both the ulnar and radial aspects of his wrist.  *See id*.  Dr. Johnson's physical examination showed limited sensation and motion in Mr. W.'s right wrist, along with focal tenderness.  *See id*.  Dr. Johnson assessed that Mr. W.'s impairment was not getting better and that he was unable to work with his condition. AR 599.  Dr. Johnson recommended surgical intervention—specifically an arthroscopy of the wrist, intra-articular debridement of the triangular fibrocartilage complex, and an extensor carpi ulnaris tenolysis of the wrist.  *See id*.

Unfortunately, these surgeries did not provide Mr. W. with relief.  Mr. W. underwent an arthroscopy, debridement surgery, and tenolysis surgery in September 2014.  AR 633.  Two weeks later, at his post-operative visit, Mr. W. reported that he still had a significant amount of pain in his wrist.  AR 635.  While Dr. Johnson's physical examination found that Mr. W. had full range of motion of his hand, there was moderate swelling around his wrist and limited flexion and extension of the wrist.  *See id*.  Dr. Johnson assessed that Mr. W. likely suffered from gout and prescribed him Indomethacin, an NSAID.  AR 636.  He also opined that Mr. W. would likely be unable to work for an additional three months and might have a permanent impairment of his right wrist.  *See id*.  At his post-operative visit in December 2014, Mr. W. noted that he was attending occupational therapy and reported some improvement; but he still complained of persistent pain, significant swelling of the wrist, and difficulty lifting light objects.  AR 725–26. Dr. Johnson's physical examination found mild tenderness and moderate swelling.  AR 726.  He found Mr. W.'s progress to be slow and noted a concern that Mr. W. would have a permanent disability considering the lack of improvement.  *See id*.  Mr. W. declined an injection and Dr. Johnson encouraged continued splint use.  *See id*.

Further examinations uncovered carpal tunnel syndrome and persistent right wrist pain. An electrodiagnostic study in January 2015 suggested that Mr. W. suffered from carpal tunnel syndrome.  AR 712–14.  During a February follow-up visit, Dr. Johnson suspected carpal tunnel syndrome after reviewing the results of the electrodiagnostic study and sent Mr. W. to a nerve conduction study.  AR 1283–84.  Following the nerve conduction study, in April, Dr. Johnson injected Mr. W. with a diagnostic steroid to treat the pain associated with carpal tunnel syndrome.  AR 776, 796, 1292–93.  During a follow-up visit in May, Mr. W. noted that the injection did not alleviate his wrist pain.  AR 796, 1065.  Accordingly, Dr. Johnson diagnosed Mr. W. with right carpal tunnel syndrome and recommended right carpal tunnel surgery; Mr. W. agreed to undergo surgery at the earliest convenient date.  AR 797.

Mr. W. continued to report right wrist pain, and Dr. Johnson continued to treat him, leading to a carpectomy surgery.  In October 2015, Mr. W. complained of persistent and significant pain in his right wrist and Dr. Johnson detected moderate fusiform swelling of the right wrist and some patchy erosions of the carpal row.  AR 1091.  Dr. Johnson again suggested right carpal tunnel release surgery and Mr. W. agreed to undergo surgery.  AR 1092.  But upon further review during a January 2016 visit, Dr. Johnson noted Mr. W.'s numerous treatments and surgeries over the previous two years and Mr. W.'s then-current complaints of refractory pain in his right wrist and advised Mr. W. that he would either have to live with the pain or undergo proximal row carpectomy surgery instead of right carpal tunnel release surgery.  AR 1341–42. On October 28, 2016, Mr. W. complained to Dr. Johnson that he was experiencing significant activity related pain in his right wrist.  AR 1474.  A physical examination showed a limited range of motion for his wrist; Dr. Johnson assessed that he was worried the proximal carpectomy would not solve Mr. W.'s underlying crystalopathy and that it would be best to treat

symptomatically.  AR 1475.  Dr. Johnson prescribed Mr. W. Indomethacin to treat his gouty pain.  *See id*.  Despite concerns, Mr. W. underwent right proximal row carpectomy and radial styloidectomy in April 2017.  AR 1102.  After the surgery, Mr. W. complained of persistent pain and asked about potential progress for increased range of motion; but Dr. Johnson said the procedure's goal was to alleviate pain, not bring back motion.  AR 1615–16.  Dr. Johnson recommended carpal tunnel surgery again in August 2017, but Mr. W. declined to undergo surgery at that time.  AR 1650.

### B. Bilateral Shoulder Impairment

Mr. W. also complained of bilateral shoulder impairment since August 2014.  He began seeing Dr. Gregory Ford with complaints of pain in his left shoulder and noted bilateral rotator cuff surgeries in 2004 and 2008.  AR 607, 611.  An x-ray of Mr. W.'s left shoulder showed no acute fracture, subluxation, or dislocation.  AR 611.  Dr. Ford diagnosed Mr. W. with tendonitis of the left shoulder and mild left shoulder impingement syndrome.  *See id*.  Dr. Ford prescribed a trial of Meloxicam and Ultram and advised him to begin a shoulder strengthening exercise program and to increase his activity as tolerated.  AR 612.  The following month, Mr. W. complained of right shoulder pain to Dr. Richardson.  AR 1235.  In February and March 2016, Mr. W. complained of bilateral shoulder pain and tenderness; he was encouraged to rest, use cold compresses, and take NSAIDs.  AR 1353–54, 1359.

### III.  Opinion Evidence

Mr. W.'s record includes opinion evidence from Dr. Johnson along with state agency physician assessments.  Mr. W.'s medical records were reviewed by two state agency physicians in 2014.  Mr. W.'s records were reviewed by Dr. Veronica Bedeau in April and Dr. Fizzeh Nelson-Desiderio in August.  Both doctors opined that Mr. W. could perform light work but was

limited to pushing, pulling, and carrying less than ten pounds with his right hand.  AR 94, 133.

Both doctors also opined that Mr. W. was limited with regard to gross and fine manipulation of

his right hand.  AR 95, 133.  Dr. Nelson-Desiderio noted that Mr. W. was limited with regard to

reaching overhead with his left arm.  AR 133.

Dr. Johnson consistently opined that Mr. W.'s physical capabilities were limited over the

years.  In August 2014, Dr. Johnson completed a Physical Capabilities Evaluation in which he

assessed a poor prognosis for Mr. W.'s assumed tendinitis of the right wrist.  AR 652.  He opined

that Mr. W.'s symptoms were constantly severe enough to interfere with his attention and

concentration required to perform simple work-related tasks.  *See id*.  He further opined that Mr.

W. could sit for 8 hours, stand for 4 hours, and walk for 4 hours during an 8-hour workday, but

could never lift an item and could occasionally carry zero to five pounds.  AR 652–53.  He could

use his right hand for simple grasping twenty-five percent of the day, for pushing and pulling

twenty percent of the day, and fine manipulation for twenty percent of the day.  AR 653.  Mr. W.

was assessed as occasionally being able to reach above shoulder level but being unable to crawl

or climb.  AR 654.  Finally, Dr. Johnson noted that Mr. W. required unscheduled breaks

throughout the day to stretch, move around, and release tension in his arms, shoulder, and hands.

AR 654.  Dr. Johnson's concerns continued over the years.

In January 2015, Dr. Johnson completed a Medical Source Statement Physical.  AR 768.

In Dr. Johnson's report, he opined that Mr. W.'s right wrist impairment resulted in chronic wrist

pain and stiffness and often interfered with his attention and concentration required to perform

simple work-related tasks.  *See id*.  He stated that Mr. W. could sit, stand, and walk for 8 hours

total during a workday and could only occasionally lift or carry up to five pounds.  AR 768–69.

He further opined that Mr. W. could not use his right hand for simple grasping, pushing and

10

pulling, or fine manipulation.  AR 769.  Dr. Johnson noted that Mr. W. could never crawl or

climb and that he should avoid moderate exposure to unprotected heights, moving machinery,

and marked changes in temperature and humidity.  AR 770.  Dr. Johnson's final note was that

Mr. W.'s persistent severe pain had been refractory, thus making it difficult to treat his right

wrist impairment.  AR 771.

In a February 2018 Treating Source Statement, Dr. Johnson opined that Mr. W. could not

lift, carry, or perform any fine or gross manipulation with his right upper extremity and could

only occasionally reach, handle, finger, feel, and push and pull with his left upper extremity.  AR

1047–50.  Further, Dr. Johnson noted that Mr. W. would be off task more than twenty-five

percent of the workday and absent more than four days per month.  AR 1048.

## IV.   Vocational Expert Testimony During Administrative Hearing

The administrative hearing on Mr. W.'s claims was held on March 1, 2018.  *See* AR 840.

During the administrative hearing, and per the remand order, a vocational expert answered the

ALJ's hypotheticals and provided potential jobs that Mr. W. could perform within in the national

economy given certain limitations.  AR 843–50.  Considering the hypothetical limitations, the

vocational expert testified that such an individual would be capable of working as a router,

inspector, counter clerk, or a bakery worker.  AR 845, 847.  These potential jobs were used in the

ALJ's evaluation at step five.

## V.   The ALJ's Decision

The ALJ found Mr. W. was disabled, and thus entitled to supplemental security income

benefits under the Social Security Act, but only as of October 28, 2016.  AR 829–30.  The ALJ

determined that Mr. W. met the insured requirements of the Act; that he had not engaged in

substantial gainful activity since his alleged onset date; and that Mr. W. had several "severe

impairments," including degenerative disc disease of the right hand, right wrist, left shoulder,

and right shoulder.  AR 811.  He nevertheless found that Mr. W. was not disabled before October 28, 2016 because his impairments did not meet or equal the severity of any of the impairments in the Commissioner's Listings, AR 812, and because significant jobs existed in the national economy at Mr. W.'s residual functional capacity to permit him to successfully adjust to available work.  AR 813–22.  But, beginning on October 28, 2016, the ALJ found that because of additional RFC limitations, AR 822, more consistent alleged functional limitations, AR 822–27, and vocational expert testimony, no jobs existed in the national economy that Mr. W. could perform as of this date.  AR 829–30.  Instead of filing a request for review to the Appeals Council, Mr. W. submitted untimely "Exceptions to the Final Decisions," to which the Appeals Council did not respond.  AR 802–03.  Mr. W. now asks that this Court review the ALJ's opinion pursuant to 42 U.S.C. § 405(g).

## LEGAL STANDARD

Federal district courts have the authority "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g). Remand is appropriate "if the record is incomplete, or if the ALJ's reasoning is not fully articulated."  *Warfield v. Colvin*, 134 F. Supp. 3d 11, 16 (D.D.C. 2015) (citing *Ademakinwa v. Astrue*, 696 F. Supp. 2d 107, 111 (D.D.C. 2010)).  Reversal is appropriate when "the record in the case has been thoroughly developed, and a rehearing would merely function to delay the award of benefits."  *Martin v. Apfel*, 118 F. Supp. 2d 9, 18 (D.D.C. 2000).

A reviewing court must uphold the Commissioner's decision "if it is based on substantial evidence in the record and correctly applies the relevant legal standards."  *Butler*, 353 F.3d at 999; 24 U.S.C. § 405(g).  "Substantial-evidence review is highly deferential to the agency fact-

finder." *Rossello v. Astrue*, 529 F.3d 1181, 1185 (D.C. Cir. 2008). This standard only requires "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Butler*, 353 F.3d at 999 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The movant must provide "more than a scintilla [of evidence], but [the standard] can be satisfied by something less than a preponderance of the evidence." *Fla. Mun. Power Agency v. FERC*, 315 F.3d 362, 366 (D.C. Cir. 2003) (quoting *FPL Energy Me. Hydro LLC v. FERC*, 287 F.3d 1151, 1160 (D.C. Cir. 2002)). "The plaintiff bears the burden of demonstrating that the Commissioner's decision [was] not based on substantial evidence or that incorrect legal standards were applied." *Feenster v. Colvin*, 220 F. Supp. 3d 123, 128 (D.D.C. 2016) (alteration in original) (internal quotation marks and citations omitted).

A reviewing court must "carefully scrutinize" the entire record when determining whether the Commissioner's decision is supported by substantial evidence. *Butler*, 353 F.3d at 999. Thus, the inquiry focuses on whether the ALJ "has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits." *Crawford v. Barnhart*, 556 F. Supp. 2d 49, 52 (D.D.C. 2008) (quoting *Butler*, 353 F.3d at 999). Courts, however, "may not reweigh the evidence and replace the [Commissioner's] judgment regarding the weight of the evidence with its own." *Cunningham v. Colvin*, 46 F. Supp. 3d 26, 32 (D.D.C. 2014) (quoting *Brown v. Barnhart*, 370 F. Supp. 2d 286, 288 (D.D.C. 2005)).

## DISCUSSION

Mr. W. challenges the ALJ's finding that he became disabled on October 28, 2016 and was not disabled prior to that time.[5] He broadly contends that the ALJ's decision is not

---

[5] Mr. W. claims to have been disabled since May 15, 2013, and applied for disability benefits on December 18, 2013. *See* AR 808.

supported by substantial evidence because (1) it does not give appropriate weight to the medical

opinions of Dr. Johnson, Mr. W.'s treating physician; and (2) it is not based upon a logical

bridge between the evidence and this finding.  *See* Pl.'s Br. at 1.  The Commissioner argues that

substantial evidence supports the ALJ's decision because the ALJ (1) provided legally sufficient

reasons for assigning Dr. Johnson's opinion limited weight; and (2) a logical bridge exists

between the evidence and the assessed RFC limitations.  *See* Def.'s Mot. at 4.  The Court will

now evaluate the parties' arguments.

## I.       Subject Matter Jurisdiction

The Court must first determine if it has subject matter jurisdiction over this matter, as Mr.

W. did not fully exhaust his administrative remedies.  Whether social security insurance and

disability insurance benefits claimants have exhausted their administrative remedies before they

have reached a district court bears on the court's grant of subject matter jurisdiction.  *See*

*Weinberger v. Salfi*, 422 U.S. 749, 763–64 (1975).  A claimant must go through the following

four steps to exhaust their administrative remedies: (1) an initial determination; (2) a

reconsideration; (3) a hearing before an ALJ; and (4) an Appeals Council Review.  *See* 20 C.F.R.

§ 404.900(a)(1)-(4).  After claimants complete this process, Section 405(g) of the Social Security

Act allows judicial review of "any final decision . . . made after a hearing."  42 U.S.C. § 405(g).

This provision includes jurisdictional and non-jurisdictional elements.  *See Cost v. S.S.A.*, 770 F.

Supp. 2d 45, 48 (D.D.C. 2011).  "The requirement that a plaintiff must first present his claim to

the agency is jurisdictional and cannot be waived, while the requirement that the plaintiff must

complete the agency review process is non-jurisdictional and may be waived."  *Id.*  The

exhaustion element may be waived by an agency, *see Weinberger*, 422 U.S. at 767, *or* excused

by the courts.  *See Bowen v. City of New York*, 476 U.S. 467, 484 (1986); *Mathews v. Eldridge*, 424 U.S. 319, 328 (1976).

Here, the agency has waived the administrative exhaustion requirement, and the Court has subject matter jurisdiction over Mr. W.'s claims.  Mr. W. did not request review of the ALJ's decision from the Appeals Council, thus the Commissioner did not render a final decision below, as envisioned by 42 U.S.C. § 405(g).  As such, Mr. W. did not fully exhaust his administrative remedies below.  But the Commissioner's Answer states that Mr. W. exhausted his administrative remedies and that his case is an appeal of a final administrative decision that denied Mr. W. disability insurance benefits.  *See* Answer ¶¶ 5–6; Def.'s Mot. at 3.  Considering the Commissioner's admissions and decision to not brief this non-jurisdictional issue, the agency has waived the administrative exhaustion requirement.  Thus, the Court finds that it has subject matter jurisdiction over Mr. W.'s claims and will now discuss the parties' substantive arguments.

## II.    The ALJ Afforded Appropriate Weight to the Treating Physician's Opinion

### A.   *The Treating Physician Rule*

A reviewing court will not reweigh evidence considered by the Commissioner.  *See Brown*, 370 F. Supp. 2d at 288.  Disability claims filed before March 27, 2017, are nevertheless subject to the D.C. Circuit's "treating physician rule."  *Butler*, 353 F.3d at 1003 (articulating the rule); 20 C.F.R. §§ 404.1513, 416.913 (noting the sunset date for §§ 404.1527 and 416.927—the regulations underlying the treating physician rule).[6]  When applicable, the rule makes a

---

[6] This Circuit's treating physician rule is based on regulations codified at 20 C.F.R. §§ 404.1527 and 416.927.  *See Butler*, 353 F.3d at 1003.  Those regulations have since been revised.  *See* 82 Fed. Reg. 5844, 5865 (Jan. 18, 2017) (adopting revised evidentiary rules); 20 C.F.R. § 404.1513 (noting the March 2017 sunset date for § 404.1527); *id.* § 416.913 (same, for § 416.927).  This case involves a claim for benefits filed in November 2015.  *See* AR 279, 283. The Court thus need not consider whether the Commissioner's adoption of new rules for the

claimant's treating physician's report "'binding on the fact-finder unless [the physician's opinion is] contradicted by substantial evidence.'" *Id.* (quoting *Williams v. Shalala*, 997 F.2d 1494, 1498 (D.C. Cir. 1993)).  Stated differently, the rule "creates a presumption in favor of treating physicians' opinions of claimants' conditions." *Turner v. Astrue*, 710 F. Supp. 2d 95, 105 (D.D.C. 2010) (citing *Poulin v. Bowen*, 817 F.2d 865, 873 (D.C. Cir. 1987)).  The Commissioner may depart from the recommendation of a treating physician under the rule, but "the ALJ bears the burden of explaining why he [or she] has rejected the treating physician's opinion and how the doctor's assessment is 'contradicted by substantial evidence.'" *Id.* (quoting *Williams v. Shalala*, 997 F.2d 1494, 1498 (D.C. Cir. 1993)).  The rule stems from regulations directing the Commissioner to accord "controlling weight" to a treating source's medical opinion if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record.  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  The premise is that "a claimant's treating physicians have great familiarity with [her] condition," so their reports deserve "substantial weight." *Butler*, 353 F.3d at 1003.

The treating physician rule does not require ALJs to adopt every opinion a treating physician offers.  ALJs may reject opinions that lack record support.  *See Turner v. Astrue*, 710 F. Supp. 2d 95, 106–07 (D.D.C. 2010).  However, if an ALJ rejects a treating physician's opinion, he must explain his reasons for doing so and "how the doctor's assessment is contradicted by substantial evidence." *Id.* at 106 (quoting *Williams*, 997 F.2d at 1498) (internal quotation marks omitted); *see also Butler*, 353 F.3d at 1003.  When discounting a treating physician's opinion, an ALJ need not reference the treating physician factors. *See Grant v.*

---

evaluation of opinion evidence permits this Court to deviate from the D.C. Circuit's treating physician rule set forth in *Butler* and *Williams*.  The rule applies to this case.

*Astrue*, 857 F. Supp. 2d 146, 154–55 (D.D.C. 2021).  "The regulations require only that 'good reasons' be provided for the weight given a treating physician's opinion."  *Id.* at 155 (citing *Turner*, 710 F. Supp. 2d at 106 (quotation omitted)).  An ALJ satisfies this duty by noting evidence contrary to the physician's opinion even where the ALJ does not make a direct comparison between medical evidence and the physician's opinion.  *See Williams*, 997 F.2d at 1499.  SSA regulations identify six factors that guide the ALJ's assessment of what weight to give a treating physician's medical opinion in the event that the opinion does not warrant controlling weight: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability; (4) consistency; (5) specialization (*i.e.*, the medical opinion of a specialist); and (6) other factors that tend to support or contradict the medical opinion.  *See* 20 C.F.R. §§416.927(c)(2)-(6); *see also Turner*, 710 F. Supp. 2d at 106–07.

### B.  The ALJ Properly Weighed Dr. Johnson's Opinion When Calculating Mr. W.'s Manipulative Limitations During the Pre-Disability Period

Mr. W. takes issue with the ALJ's assessment of his residual functional capacity and the ALJ's underlying findings regarding Mr. W.'s limitations.  Specifically, Mr. W. argues that the ALJ substituted his analysis for Dr. Johnson's when he rejected the limitations on (1) reaching, (2) handling and fingering, (3) pushing and pulling, and (4) lifting and carrying and manipulating outlined in Dr. Johnson's medical source statements.  *See* Pl.'s Br. at 14.  He also asserts that these significant limitations were work preclusive considering the vocational expert's testimony.  *See id*.  While the vocational expert is not a treating source, the Court will consider this argument at the end of this section because Mr. W. asserts that it supports his limitations argument.  The Commissioner argues that treating source statements alone do not control an ALJ's analysis and that the ALJ's explanations for why he did not adopt Dr. Johnson's limitations for the relevant

period[7] were sufficient.  *See* Def.'s Mot. at 16–19.  The Court agrees with the Commissioner and finds that the ALJ identified substantial evidence and adequately justified his assessment of the treating physician's opinion.

1.  Reaching

The ALJ found that Mr. W. was limited to occasionally reaching with his non-dominant left upper extremity because of his severe left shoulder impairment.  AR 820.  This limitation, while more specific, is consistent with Dr. Johnson's opinions that Mr. W. could "occasionally" and "continuously" reach above shoulder level.  AR 654, 770.  To support his conclusion, the ALJ also referred to Dr. Nelson-Desiderio's state agency physician assessment, AR 820, which opined that Mr. W. was limited in his ability to reach overhead on his left.  AR 133.  The ALJ cited Dr. Johnson's opinion, noting that his finding was consistent with said opinion, and explaining that the right hand and wrist impairment would not affect reaching.  AR 820.  Thus, the Court is convinced that the ALJ afforded appropriate weight to Dr. Johnson's opinion, and finds that substantial evidence supports the ALJ's conclusion regarding Mr. W.'s reaching limitations.

2.  Handling and Fingering

Mr. W. argues that the ALJ erred in assessing his handling (grasping) and fingering (fine manipulation) limitations, because Dr. Johnson's 2015 medical source statement stated that he could not handle or finger objects after his September 2014 right wrist surgery.  Before considering Dr. Johnson's opinions, the ALJ reviewed and discussed the record evidence and

---

[7] Because Mr. W. challenges the ALJ's decision to not find him disabled before October 28, 2016, the relevant period for this inquiry is May 15, 2013 (alleged disability onset date) through October 28, 2016 (established disability onset date).  Record evidence or medical source opinions dated after this period shall not be considered.

accommodated Mr. W.'s right wrist impairment by limiting him to occasionally handling and fingering with his right upper extremity. *See* AR 814–17. Ultimately, the ALJ agreed with Dr. Johnson that Mr. W. was limited in his ability to handle and finger with his dominant right upper extremity *before* his September 2014 right wrist surgery, and he noted that Drs. Bedeau and Nelson-Desiderio's medical assessments and Dr. Johnson's 2014 medical source statement support this finding. AR 820. The ALJ also agreed that Mr. W. should have been limited to no handling or fingering shortly after the surgery, as opined in Dr. Johnson's 2015 medical source statement. *See id.* The ALJ noted how Mr. W. "continued to be symptomatic" after the surgery and that "Dr. Johnson was concerned there would be permanent impairment as [Mr. W.] was not improving and EMG NCV testing in January 2015 showed a right carpal tunnel syndrome." *Id.* Nevertheless, the ALJ assumed the need for these limitations would not last and that Mr. W.'s symptoms would improve after more physical therapy, thus validating his RFC limitation. *See id.*

Although the ALJ did not directly contrast his rejection of Dr. Johnson's 2015 fingering and handling limitation with record evidence, his earlier discussion regarding Mr. W.'s right wrist impairment following Dr. Johnson's 2015 medical source statement provides adequate support for his conclusion that Mr. W. is limited to occasionally handling and fingering with his right upper extremity. The ALJ considered the record and noted that although Mr. W. reported consistent pain after his right wrist surgery, his condition stabilized with treatment before October 2016. *See* AR 816–17. The record would not support limiting Mr. W. to no handling or fingering objects because of the 2015 medical source statement, without considering the rest of the evidence before October 2016. *See Turner*, 710 F. Supp. 2d at 106–07. Thus, substantial

evidence supports the ALJ's conclusion to limit Mr. W. to occasionally handling and fingering with his upper right extremity.

Mr. W. also argues the ALJ relied on speculation that he would probably improve to discredit Dr. Johnson's 2015 opinion regarding fingering limitations, and that Dr. Johnson's 2018 medical source statement proves that speculation false. *See* Pl.'s Br. at 15. But Dr. Johnson's 2018 medical source statement, which stated that Mr. W. had no functional use of his right arm/hand, AR 1050, was not relevant to the ALJ's conclusion because that submission postdates the date on which the ALJ found Mr. W. disabled—October 28, 2016. Although the ALJ may have misjudged the future improvement in Mr. W's condition, that does not change the fact that the record evidence discussed above adequately supports the ALJ's conclusion on this issue.

### 3. Pushing and Pulling

Next, the ALJ found that Mr. W. was limited to pushing and pulling ten pounds or less with his upper right extremity. AR 817. Dr. Johnson's 2014 medical source statement limited Mr. W. to pushing and pulling up to twenty percent of an eight-hour workday, and did not address the amount of weight that he could push or pull. AR 653. Dr. Johnson's 2015 medical source statement did not include any pushing/pulling limitations. AR 768-71. In fashioning his limitation, the ALJ noted that Drs. Bedeau and Nelson-Desiderio's medical assessments limited Mr. W. to pushing and pulling no more than ten pounds. AR 820–21. Ultimately, the ALJ found the variations "immaterial given vocational expert testimony to the effect that none of the below [potential] three jobs require any pushing and/or pulling with the dominant right upper extremity." AR 821. That explanation satisfied the ALJ's obligation to provide "good reasons" for not adopting Dr. Johnson's proposed limitation when he noted that none of the potential jobs

would require this type of manipulation, and substantial evidence supports the ALJ's conclusion regarding pushing and pulling limitations.  *See Grant*, 857 F. Supp. 2d at 155.

    4.  <u>Lifting and Carrying</u>

The ALJ also found that Mr. W. was unable to lift and carry more than ten pounds with his upper right extremity.  AR 817.  This manipulative limitation is less restrictive than Dr. Johnson's opinions.  Dr. Johnson's 2014 statement restricted Mr. W. to occasionally carrying five pounds or less and never lifting anything, AR 653, while his 2015 statement restricted Mr. W. to occasionally lifting and carrying five pounds or less.  AR 769.  The ALJ rejected the 2014 limitations because "an individual must necessarily lift an object before carrying such an object." AR 821.  He also rejected the 2015 limitations, even though they allowed for lifting before carrying, because "the vocational expert testified persuasively that the [potential] three jobs could still be performed."  *Id*.  Again, the ALJ provided "good reasons" for not adopting Dr. Johnson's limitations when he noted the vocational expert's testimony.  *See Grant*, 857 F. Supp. 2d at 155.  Thus, substantial evidence supports the ALJ's finding regarding Mr. W.'s lifting and carrying limitations.

    5.  <u>Vocational Expert Testimony</u>

Finally, Mr. W. argues that the vocational expert's testimony during the hearing supports a finding that the limitations that Dr. Johnson recognized rendered Mr. W. unable to work during the relevant period.  *See* Pl.'s Br. at 14.  This testimony does not necessarily stand for this proposition.  Earlier in the hearing, the ALJ asked the vocational expert whether any jobs existed in the national economy for an individual with limitations like those outlined in Dr. Johnson's medical source statements.  AR 843–50.  As previously noted, the vocational expert testified that

such an individual would be capable of working as a router, inspector, counter clerk, or a bakery worker.  AR 845, 847.

Following the ALJ's questioning, Mr. W.'s attorney questioned the vocational expert about the expert's testimony.  In particular, the attorney asked if an individual who "could lift occasionally zero to five [pounds] and carry occasionally zero to five [pounds] and nothing else . . . would preclude light work."  AR 855.  In response, the vocational expert stated that this would be work preclusive, but it became clear that the expert was confused by the questioning.  AR 855–56.  To resolve inconsistencies between the vocational expert's answer to this question and the expert's prior testimony, the ALJ redirected the vocational expert and Mr. W.'s attorney examination, ultimately asking the vocational expert whether Mr. W. could still perform the identified jobs with limitations.  *See* AR 856–58.  Again, the vocational expert testified that an individual with Mr. W.'s limitations could work as a router, an inspector, and a bakery worker.  AR 858.  Contrary to Mr. W.'s assertion, the vocational expert's testimony, when assessed as a whole, does not support a finding that Dr. Johnson's noted limitations are work preclusive.  Thus, substantial evidence supports the ALJ's decision.

### C.  The ALJ Had a "Legitimate Medical Basis" for Denying Mr. W.'s Claim During the Pre-Disability Period

Mr. W. also argues the ALJ erred because he did not evaluate Dr. Johnson's medical opinion evidence with respect to the factors enumerated in § 404.1527(c).  *See* Pl.'s Br. at 15–16.  But, as stated above, an ALJ need not discuss each factor when according weight to a treating physician's opinion.  *See Grant*, 857 F. Supp. 2d at 154–55.  The ALJ gave good reasons when discussing his reasons for rejecting some of Dr. Johnson's conclusions regarding Mr. W.'s limitations and provided evidence and reasoning to support his conclusions.  *See id*. at 155 (citing *Turner*, 710 F. Supp. 2d at 106 (quotation omitted)); *Williams*, 997 F.2d at 1499.

Mr. W. also contends that the ALJ "needed to have a legitimate medical basis" for denying his claim. Pl.'s Br. at 16. He asks the Court to assume, "for the sake of argument, that a reasonable ALJ could have questions regarding Plaintiff's impairments or symptoms, or about the consistency of the only examining medical opinion with the underlying record." *Id*. In such a situation, Mr. W. asserts that the ALJ could have: (1) ordered a consultative examination; (2) contacted Dr. Johnson for clarification or more specific limitations; (3) asked the State Agency to review the AR; or (4) asked a medical expert to review the AR. *See id*. The Commissioner asserts that the ALJ was not required to take any of the steps listed by Mr. W. *See* Def.'s Mot. at 19–20.

The Court agrees with the Commissioner's positions and finds that the ALJ acted well within his discretion in declining to obtain additional opinions and reviews of the record. First, an ALJ should only require a consultative examination if "the evidence as a whole, both medical and nonmedical, is not sufficient to support a decision." 20 C.F.R. § 404.1519a(b). Also, the decision to order a consultative examination is discretionary. *See Sims v. Apfel*, 224 F.3d 380, 381–82 (5th Cir. 2000). Here, a consultative examination was not necessary because the record evidence was sufficient to support the ALJ's disability determination. Second, ALJs are only required to recontact a medical source if the information is inadequate to determine whether a claimant is disabled or not. *See* 20 C.F.R. § 404.1520b(b)(2)(i). Recontacting Dr. Johnson was not required because the information in the record was sufficient to determine whether or not Mr. W. was disabled. Third, the ALJ was not required to send the AR back to the state agency for review, and the Court has found no precedent suggesting otherwise. Finally, ALJs are required to seek opinions from medical experts in three narrow circumstances, none of which are present in this case. *See* HALLEX § I-2-5-34 (S.S.A.), 1994 WL 637370 (listing mandatory and

discretionary reasons for an ALJ to seek a medical expert opinion).  The Court recognizes that an opinion from a medical expert may have been helpful, but the ALJ was well within his discretion to not request such an opinion.  Accordingly, the ALJ had a "legitimate medical basis" to deny Mr. W.'s disability benefits claim for the period before October 28, 2016.

### III.    A Logical Bridge Exists Between the Evidence and the ALJ's Determination That October 28, 2016 Was the Disability Onset Date

Mr. W. argues that the ALJ's conclusion that October 28, 2016 was Mr. W.'s disability onset date was "not related to any new development, test results, or any other evidence establishing a logical bridge between the finding and the evidence."  Pl.'s Br. at 18 (citation omitted).  Mr. W. quotes a portion of the ALJ decision that discusses his October 28, 2016 doctor's visit, during which he noted his right wrist and bilateral shoulder impairments.  *See id.* (quoting AR 822).  He asserts that the record is replete with mentions of his right wrist and bilateral shoulder impairments from 2013 through October 2016, and that nothing about the October 28, 2016 visit is unique.  *See id.*  The Commissioner references the same portion of the ALJ's decision and argues that this explanation was enough to satisfy the ALJ's burden.  *See* Def.'s Mot. at 22–23.  While October 28, 2016 was not the first mention of Mr. W.'s impairments, the ALJ's decision creates a logical bridge between the record evidence and this established onset date and the related RFC assessments.  The ALJ thoroughly and adequately explained how the record evidence and treating physician opinions support his pre-disability reaching, handling, fingering, pushing, and pulling RFC limitations, as discussed below.  *See* AR 815–18, 820–21.

Invocation of the logical bridge argument necessitates a discussion about the related RFC limitations as "SSR 96-8p requires that the ALJ build a 'logical bridge' from the evidence to his

conclusion." *Banks v. Astrue*, 537 F. Supp. 2d 75, 84 (D.D.C. 2008) (citation omitted).  The

ALJ's discussion must include the following:

> [A] thorough discussion and analysis of the objective medical and other evidence, including the individual's complaints of pain and other symptoms and the adjudicator's personal observations, if appropriate; a resolution of any inconsistencies in the evaluation as a whole; and a logical explanation of the effects of the symptoms, including pain, on the individual's ability to work.

SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996).  If such a connection exists, the ALJ's

decision is supported by substantial evidence.  *See Pittman v. Berryhill*, No. 15-cv-1543, 2017

WL 1292980, at *5 (D.D.C. Mar. 6, 2017).

    1.  <u>Reaching</u>

    First, a logical bridge exists between the record evidence and the ALJ's conclusions

regarding Mr. W.'s reaching limitations.  The ALJ limited Mr. W. to occasionally reaching with

his non-dominant left upper extremity due to his severe left shoulder impairment.  AR 820.  This

limitation is consistent with Dr. Johnson's opinions that Mr. W. could "occasionally" and

"continuously" reach above shoulder level.  AR 654, 770.  The ALJ also referred to Dr. Nelson-

Desiderio's state agency physician assessment, AR 820, which opined that Mr. W. was limited in

his ability to reach overhead on his left, AR 133.  Thus, the Court finds that this RFC limitation

is supported by substantial evidence.

    2.  <u>Handling and Fingering</u>

    The ALJ properly assessed that Mr. W. was able to occasionally handle and finger with

his right upper extremity.  AR 817, 820.  Dr. Johnson's opinions limited Mr. W. to occasional

handling and fingering before his right wrist surgery in August 2014 and to *no* handling or

fingering in January 2015 after his September 2014 right wrist surgery.  Notwithstanding the

more restrictive post-surgery limitation, the ALJ held that the latter limitations were unlikely to

last considering probable improvement post-surgery and concluded that Mr. W. could occasionally handle and finger before the October 2016 disability onset date. AR 817, 820. As the relevant period for this analysis ends in October 2016, the Court considers Dr. Johnson's 2014 and 2015 statements. Considering Mr. W. underwent the September 2014 right wrist surgery to stabilize his pain, it was reasonable for the ALJ to assume that Mr. W.'s right wrist impairment and symptoms would improve to a degree following surgery-related pains. Thus, the Court finds the handling and fingering RFC limitation valid and supported by substantial evidence.

3.  <u>Pushing and Pulling</u>

The ALJ's explanation for the pushing and pulling limitations are similarly appropriate considering the record and Dr. Johnson's opinions. Dr. Johnson's August 2014 opinion limited Mr. W. to pushing and pulling with his right hand for twenty percent of an eight-hour workday, AR 653, while his January 2015 opinion further limited Mr. W. to never pushing or pulling during the workday. AR 769. The ALJ noted that the state agency physician assessments opine that Mr. W. should be limited to pushing and pulling no more than ten pounds but found the different assessment irrelevant because the vocational expert testified that the three potential jobs do not require pushing or pulling with the right upper extremity. AR 820–21. Considering the ALJ's discussion, the Court finds the ALJ's pushing and pulling RFC limitation valid and supported by substantial evidence.

4.  <u>Lifting and Carrying</u>

While the lifting and carrying no more than ten pounds limitation was not as developed as the others, a logical bridge exists. The ALJ's limitation was less restrictive than Dr. Johnson's opinions. The August 2014 medical source statement assessed that Mr. W. could never lift

objects but could occasionally carry zero to five pounds. AR 653.  The ALJ stated that was

"inconsistent as an individual must necessarily lift an object before carrying such an object."  AR

821.  The January 2015 medical source statement assessed that Mr. W. could occasionally lift

and carry zero to five pounds.  AR 769.  The ALJ disregarded these opinions and relied on the

vocational expert's testimony in response to a hypothetical that assumed a person with similar

impairments could occasionally lift and carry *twenty* pounds or could frequently lift and carry *ten*

pounds.  *See* AR 844.  The vocational expert found that such an individual would be able to

either work as a counter clerk, router, or inspector.  AR 844–45.  Accordingly, the ALJ assessed

Mr. W.'s RFC limitations at ten pounds, not five.  AR 817.  This limitation, albeit less restrictive,

seems to be adequate considering the vocational expert's testimony.  Thus, the Court finds this

RFC limitation supported by substantial evidence.

## CONCLUSION AND ORDER

For the reasons stated above, the Court **DENIES** Mr. W.'s Motion for Judgment of

Reversal and **GRANTS** the Commissioner's Motion for Judgment of Affirmance.

Date: September 15, 2022        _____

ROBIN M. MERIWEATHER
UNITED STATES MAGISTRATE JUDGE

27